# AFFIDAVIT  1: 12 MJ 4097

I, Lars E. Schvartz, Special Agent of the United States Secret Service, Cleveland, Ohio, being duly sworn, depose and state as follows:

I am currently employed as a Special Agent with the United States Secret Service (USSS) in Cleveland, Ohio. I am a Certified Fraud Examiner (CFE) and I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center, Glynco, Georgia, and the U.S. Secret Service Special Agent Training Course in Beltsville, Maryland, where my studies have included several investigative courses specifically dealing with bank fraud, credit card fraud and manufacturing, distributing and possessing counterfeit obligations and securities of the United States.

1. I have received training in the enforcement of laws concerning bank fraud and financial crimes as found in Title 18 of the United States Code.

2. The following information is based on my own personal observations, knowledge, and experience, as well as information that I received from other law enforcement officers and other persons.

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a complaint charging Milen Zhelyazkov Marinov (Marinov) with a violation of Title 18, United States Code, Sections 1029(a)(1) and (b)(2), it does not contain all of the information known to me concerning this investigation.

**Background Information:**

4. The facts in this investigation reveal that Marinov engaged in an organized Access Device Fraud scheme which revealed that Marinov, along with other unknown

individuals, knowingly engaged in and conspired to perpetuate Access Device Fraud by placing skimming devices on various Automated Teller Machines (ATM) to capture account information of unsuspecting bank customers with the intent to commit bank fraud. Access Device Fraud is the illegal act of electronically obtaining account data through a fraudulent scheme or artifice with the purpose of using the obtained data to access bank accounts or other protected information used in electronic financial transactions without authorization.

As part of the scheme, Marinov and others would affix a magnetic card reader (skimmer) overtop of the native ATM device and intercept card data as the account holder entered their debit card and associated Personal Identification Number (PIN) to access their account information. Marinov and others would subsequently transfer the collected account data from the skimmer to a blank magnetic stripe card which was used as a counterfeit access device instrument to obtain cash from various ATM's in Toledo, Ohio, Cleveland, Ohio and other known localities throughout Northern Ohio.

Additionally, PIN numbers are typically intercepted and obtained with the use of human surveillance or a small pinhole camera integrated into the fraudulent skimming device.

Through my knowledge and experience, I am aware that individuals involved Access Device Fraud schemes often attempt to conceal their identities by covering up ATM cameras, wearing hats, sunglasses, masks or any combination of the aforementioned.

Furthermore, individuals involved in Access Device Fraud schemes frequently take steps to conceal or mingle their activity by purposely using various ATM's at multiple banking locations not associated with the victim bank.

### Milen Zhelyazkov Marinov

5. On May 12, 2012, 5/3rd Bank discovered an ATM skimming device affixed to an ATM at Banking Center #949 in Toledo, Ohio located at 7536 W Central Avenue Toledo Ohio. The devise was installed at 8:50 a.m. and recovered at 3:41pm. The same day, 5/3rd Bank recovered the device and determined that 148 customer accounts had been compromised.

6. On May 16, 2012, 5/3rd Bank discovered an additional skimming device affixed to the same ATM banking center as described in paragraph 5 and determined the device had been active for twelve hours prior to discovery. Subsequent to recovering the device, 5/3rd Bank determined that an additional 210 customer accounts had been compromised.

7. On May 15, 2012 and May 16, 2012, 5/3rd Bank began tracking fraudulent ATM cash withdraws being made throughout the Toledo, Ohio area with the compromised account information obtained from the skimming devices described in paragraph 5 and 6.

8. 5/3rd Bank determined that a total of $84,922.50 was fraudulently acquired from ATM cash transactions related to the aforementioned activity between May 15, 2012 and May 16, 2012.

9. On May 17, 2012, 5/3rd Bank was notified that attempts were being made at a PNC ATM machine located at 1401 Euclid Ave, Cleveland, Ohio, to access compromised account information related to the aforementioned activities identified in paragraphs 6 and 7.

10. On the same date, May 17, 2012, a total of $21,104.50 was fraudulently acquired from various ATM's throughout the Cleveland area related to the activities identified in paragraphs 6 and 7.

11. On the same date, May 17, 2012, a 5/3rd Bank employee was alerted by the bank's security systems that an attempt was being made to access a compromised account related to the activities identified in paragraphs 6 and 7. In response to that warning, a bank employee from 5/3rd Bank attempted to contact the Cleveland Police Department to respond and investigate the attempted unauthorized ATM withdrawal.

12. Unable to contact the Cleveland Police Department, a 5/3rd Bank employee made contact with Lt. Judy Neel of Ohio State Patrol in Garfield Hts., Ohio. Lt. Neel responded to PNC Bank 1401 Euclid Ave, Cleveland, Ohio along with Trooper Jim Smith. Upon arrival, Lt. Neel and Trooper Smith discovered that Officer Smith #816 and Officer Price #2339 of the Cleveland Police Department had detained a suspect, identified as Marinov. Both Officer Smith and Officer Price stated that they responded to the PNC ATM at 1401 Euclid and witnessed Marinov walk from that PNC ATM across Euclid Ave and enter a card at an ATM machine at U.S. Bank; at which time Officer Smith and Officer Price contacted Marinov and Officer Smith noticed the suspect had very large bulges in his jeans pockets. Officer Smith checked for weapons and found large amounts of cash and credit/gift cards bundled together.

13. Lt. Neel subsequently approached the suspect, obtained personal identification and after a short conversation determined the suspect's name to be Milen Zhelyazkov Marinov, a Bulgarian Foreign National who admitted that he was in the United States illegally.

4

14. On May 17, 2012, Affiant received a phone call from Lt. Neel advising Affiant of the situation and requesting that the U.S. Secret Service respond to her Garfield Hts. post to interview the suspect regarding his alleged involvement with the aforementioned fraud.

15. Special Agent Larry Henderhan and Affiant responded to the Ohio State Patrol Garfield Hts. post and were briefed by Lt. Neel about the case. Lt. Neel advised that suspect Marinov was apprehended using a fraudulent credit/gift card with known compromised account information as determined by $5/3^{rd}$ Bank investigators. Additionally, the suspect attempted to escape from Ohio State Patrol's custody by getting out of his handcuffs, escaping through a barred window and running away from the Garfield Hts. post before being recaptured and returned to Ohio State Patrol custody.

16. On May 17, 2012, Special Agent Henderhan and Affiant read suspect Marinov his rights and presented him with U.S. Secret Service form 1737B, Warning and Consent to Speak, which he refused to sign. Suspect Marinov, however, did agree to speak to us.

17. During the interview, suspect Marinov stated that he "was here illegally." He stated he came into the United States through Mexico, and that prior to arriving in Northern Ohio, he was living in Norfolk, VA.

18. Suspect Marinov advised us that he and an unnamed friend drove from Norfolk, VA to Elyria, Ohio with the intent of meeting two other Bulgarians, unknown to him. He stated that he then agreed with the two other unknown Bulgarians to use cards to take money from ATMs. Although Marinov claims he was not familiar with the other suspects, he stated one of his accomplices was named Vasco.

5

19. Marinov advised that he came to the country illegally and participated in the scheme to take money out of ATM because he has a son in Bulgaria that is very sick and requires $1050.00 a month in medicine to help with his illness.

20. Furthermore, suspect Marinov stated he did not direct any of the activity in which he was involved but was only taking directions from the two unknown suspects.

21. Marinov stated that the vehicle used to assist in engaging in this activity a gold colored Ford Windstar with black tinted windows. (Surveillance photos from 5/3rd Bank shows the suspects were driving two vehicles; a black Hyundai sedan and a lighter colored Hyundai SUV).

22. When asked how much he was paid, Marinov stated that he has only been paid $2,000.00 since he started working with the other two suspects. Marinov advised that as part of his agreement with the unknown suspects, he was to be paid 20% of all proceeds obtained from the activity.

23. Lt. Neel and Trooper Bradford inventoried Marinov's personal belongings to include $6,545.00 in cash, 25 credit/gift cards with accompanying PIN numbers written on sticky notes. Additionally, Marinov had in his possession a hotel key card from an unknown hotel, a MasterCard debit card in the name of and individual whose initials are I.S., a Simon Mall gift card and a First Investment Bank credit/debit card in his name, Milen Marinov.

Affiant respectfully submits that the above described conduct establishes probable cause

6

to believe that Marinov engaged in and conspired with others to commit access device fraud, in violation of Title 18 United States Code, Sections 1029(a)(1) and 1029(b)(2).

Further, the affiant sayeth not.

*[signature]*
Special Agent Lars E. Schvartz
United States Secret Service

Subscribed and sworn before me this 18th day of May, 2012

*[signature]*
Nancy A. Vecchiarelli
United States Magistrate Judge